Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| DANIEL COLÓN GONZÁLEZ, NAYDA GONZÁLEZ Y LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTA POR AMBOS<br>v<br>ELIMINEX PEST EXTERMINATORS, INC.; COOPERATIVA DE SEGUROS MÚLTIPLES; WIMAT ENTERPRISES, INC.; COMPAÑÍA DE SEGUROS A, JOHN DOE, RICHARD ROE; COMPAÑÍA DE SEGUROS B y C<br><br>Apelados<br>v.<br>WIMAT ENTERPRISES; ABC COMPAÑÍA ASEGURADORA<br>Apelantes | KLAN202100847 | ***Apelación***<br>Procedente del Tribunal de Primera Instancia, Sala de Salinas<br><br>Sobre: Daños y Perjuicios<br><br>Caso Núm.: G4CI2015-00319 |

Panel integrado por su presidente, el juez Rodríguez Casillas, la juez Rivera Pérez y la juez Rivera Marchand.[1]

Rodríguez Casillas, juez ponente.

**SENTENCIA**

En San Juan, Puerto Rico, a 18 de diciembre de 2023.

Comparecen ante nos *WIMAT Enterprises, Inc.* y *Universal Insurance Company (WIMAT, Universal o parte apelante)*, para la revocación de la *Sentencia* emitida y notificada el 31 de agosto de 2021 por el Tribunal de Primera Instancia, Sala Superior de Salinas (TPI o foro recurrido).

La Sentencia apelada declaró *Ha Lugar* la demanda presentada por el señor Daniel Colón González y su esposa, la señora Nayda González Sánchez y la sociedad de legal de gananciales *(parte apelada)*. Cónsono con lo anterior, el TPI impuso

---

[1] Conforme a la Orden OATA-2023-040 se designa al Hon. Monsita Rivera Marchand para entender y votar.

a los apelantes el 40% de la responsabilidad de los daños causados a los apelados. En específico, se condenó al pago global de $195,622.00.[2]

Por los fundamentos expuestos a continuación, se **confirma** la Sentencia apelada. Veamos.

**-I-**

El **27 de agosto de 2013,** el señor Colón González conducía en horas de la madrugada por la autopista PR-52, km.64.1, sector Salinas, en dirección Norte a Sur cuando, súbitamente, impactó una capota que yacía en la vía de rodaje. La referida capota se había desprendido de un vehículo *Ford Ranger*, conducido (de manera autorizada) por el Sr. Ellie Pagán Meléndez. Sin embargo, el referido vehículo era propiedad de su patrono y/o jefe, *Eliminex Pest Exterminators, Inc. (Eliminex).*[3] Como consecuencia del impacto, el apelado sufrió los daños que originan la controversia que hoy nos ocupa.

Consecuentemente, el **16 de diciembre de 2015**, parte apelada presenta la demanda de epígrafe contra de *Eliminex, Cooperativa de Seguros Múltiples de Puerto Rico* (*Seguros Múltiples*), *WIMAT*, y otros.[4] En resumen, alegó que, como consecuencia del accidente sufrido por el señor Colón González, sufrió un sinnúmero de daños: como la pérdida total del vehículo, una serie de lesiones físicas, la pérdida del empleo en el cual llevaba doce (12) años y una "depresión mayor moderada, recurrente".[5] Además, se adujo que el accidente se debió a la negligencia combinada de los codemandados

---

[2] En cuanto al señor Colón González, se fijaron las siguientes partidas: $70,000.00 por los daños físicos, visita y estadía en la Sala de Emergencia el día del accidente, placas, exámenes y visitas médicas relacionadas; $7,500.00 por las 25 terapias físicas; $24,000.00 por el impedimento parcial permanente de un 6% de las funciones fisiológicas generales; $17,500.00 por las angustias mentales; y $64,122.00 en concepto de lucro cesante. Por otro lado, se le concedió a la señora González Sánchez una indemnización de $12,500.00 por sus sufrimientos y angustias mentales.

[3] La capota desprendida fue instalada durante el mes de noviembre de 2011, en las facilidades y, por empleados de la tercera demandada, *Wimat Enterprises, Inc.*

[4] Apéndice I de la *Apelación*, págs. 1-5.

[5] Según diagnosticado por el Dr. Ramon O. Fortuño el 30 de julio de 2015.

*Eliminex* y *WIMAT*. Específicamente, *Eliminex,* por no haber mantenido la capota de manera adecuada y con la regularidad requerida y, *WIMAT,* por haber instalado la capota en forma deficiente.

El **5 de julio de 2016**, *Eliminex* y *Seguros Múltiples* presentaron la *Demanda Contra Tercero* frente a *WIMAT* y *Universal*, aquí apelantes.[6] Alegaron que el desprendimiento de la capota era algo totalmente imprevisible y, de encontrar responsabilidad, le correspondería a *WIMAT*. Según estos, "*el desprendimiento de la capota fue el resultado de la instalación defectuosa y/o inadecuada por el tercero demandado Wimat Enterprises Inc. por lo que los daños ocurridos se deben a la conducta atribuible a este*".[7]

En vista de ello, el **9 de septiembre de 2016**, *WIMAT* presentó su *Contestación a Demanda de Tercero*.[8] De igual forma, el **30 de septiembre de 2016,** *Universal* presentó su *Contestación a Demanda*.[9] En resumidas cuentas, los apelantes alegaron que el accidente sufrido por la parte apelada había ocurrido por la culpa y negligencia de *Eliminex.* En vista de ello, solicitaron al TPI que declarara sin lugar la *Demanda Contra Tercero* y, en su consecuencia, condenara al tercero demandante *(Eliminex y Seguros Múltiples)* al pago de costas y honorarios de abogado.

Luego de varios tramites procesales, el **11 de enero de 2018**, las partes presentaron el *Informe de Conferencia con Antelación al Juicio*.[10] En síntesis, la parte apelada reafirmó su postura en cuanto a que ambos *Eliminex* y *WIMAT* eran responsables de los daños sufridos. Por otra parte, *Eliminex* expuso que entendía que la responsabilidad recaía sobre los *WIMAT* y *Universal* quienes, por su

---

[6] Apéndice III de la *Apelación*, págs. 12-14.
[7] *Id.*, en la pág. 13.
[8] Apéndice IV de la *Apelación*. págs. 15-17.
[9] Apéndice V de la *Apelación*. págs. 18-22.
[10] Apéndice VI de la *Apelación*. págs. 23-55.

parte, reiteraron que, basado en la teoría de causalidad, la parte directamente responsable era *Eliminex*.

Finalmente, el juicio en su fondo se celebró durante los días **26, 27, 28 y 29 de junio de 2018; 2 de julio de 2018; 12 y 16 de octubre de 2018**. Como peritos de la parte apelada testificaron los ingenieros Berlín Cortinas y Juan José Diaz Soultaire. Asimismo, testificaron los propios apelados, el Sr. Daniel Colón González y su esposa, la Sra. Nayda González. También, testificaron en favor de la parte apelada el Dr. Cándido Martínez, quien es fisiatra; Dr. Ernesto Pérez, quien se especializa en rehabilitación vocacional; y, el CPA Jorge Rodríguez Suarez. La parte apelante ofreció como prueba pericial a los propios ingenieros de la parte apelada.

Luego de examinar la prueba pericial y documental desfilada, el **31 de agosto de 2021**, el TPI dictó *Sentencia* declarando *Ha Lugar* la demanda por daños y perjuicios.[11] En su dictamen, hizo las siguientes determinaciones de hechos que citamos *in extenso*:

1. El 27 de agosto de 2013, alrededor de las 3 de la madrugada, el Demandante Daniel González Colón conducía su vehículo Suzuki Forza del 1987 por la autopista PR-52 en el área del Km. 64.1, sector Salinas, en dirección Norte a Sur, cuando sufrió un impacto en la parte frontal de su vehículo.
2. Este impacto fue causado por una capota que yacía en la vía de rodaje, luego que se desprendiera de la parte trasera de una guagua Ford Ranger 2011 que transitaba por la PR-52 frente al vehículo del Demandante, en la misma dirección de Norte a Sur.
3. El conductor de esa Ford Ranger era Elle Pagán Meléndez, empleado y/o contratista independiente de *Eliminex Pest Exterminators, Inc.* El Sr. Pagán estaba autorizado para conducir dicho vehículo.
4. El vehículo Ford Ranger 2011 era propiedad de la compañía *Eliminex Pest Exterminators, Inc.*
5. La capota desprendida, marca LEER, fue vendida por WIMAT a Eliminex mediante orden de compra del 9 de septiembre de 2011. WIMAT instaló la misma en un vehículo propiedad de Eliminex en o alrededor del mes de noviembre del 2011.
6. Al momento del accidente, el Demandante se dirigía en su vehículo de su residencia en Guayama a su trabajo con la compañía *LM Waste*.
7. Al llegar al kilómetro 64.1, el Demandante se encontró con la capota desprendida - cajón o "canopy" - en la vía de rodaje, frente a su vehículo.
8. La capota yacía en el carril izquierdo de la autopista PR-52, en dirección a Juana Díaz.

---

[11] Apéndice VIII de la *Apelación*. 69-98.

9. El Demandante vio la capota cuando se encontraba a unos 10 o 15 pies de distancia de esta.

10. La visibilidad al momento del accidente era pobre debido a que aún no había amanecido, estaba oscuro y no había alumbrado.

11. El Demandante intentó esquivar la capota, pero no pudo hacerlo e impactó la misma con el lado derecho de su Suzuki Forza.

12. Como consecuencia del impacto, el vehículo del Demandante se fue hacia el lado izquierdo de la autopista.

13. Eventualmente, el Demandante pudo controlar y detener su vehículo y se salió del mismo. Acto seguido realizó algunas llamadas telefónicas para informar sobre lo ocurrido.

14. Como consecuencia del impacto, el lado derecho del vehículo del Demandante quedó severamente dañado y afectado.

15. Al momento del accidente, el Demandante tenía puesto y utilizaba su cinturón de seguridad.

16. Luego del accidente, la capota permaneció en la autopista hasta que fue removida por agentes de la Policía de Puerto Rico y dos empleados de *Eliminex*.

17. Mientras un agente de la Policía preparaba el informe del accidente, el Demandante indicó que comenzó a sentirse mal, por lo que se llamó una ambulancia que lo llevó al Hospital Cristo Redentor de Guayama.

18. En el Hospital examinaron al Demandante y le tomaron placas y dieron medicamentos para el dolor.

19. Su esposa, la codemandante, se encontró con él en la Sala de Emergencia entre las 7:30 a 7:40 de la mañana. El Demandante permaneció en el hospital hasta las 2:30 o 3.00 de la tarde de ese día.

20. Al día siguiente del accidente, 28 de agosto de 2013, el Demandante fue a la ACAA, donde lo refirieron a un Fisiatra, el Dr. Linares.

21. El Demandante recibió unas 15 terapias de frío y caliente en la oficina del Dr. Linares; tanto lumbares como cervicales.

22. Luego de recibir estas terapias el Demandante indicó no sentir mejoría y tener dolor continuo, por lo que el Dr. Linares lo refirió a la clínica de manejo de dolor del Dr. Martinó.

23. El Dr. Martinó examinó al Demandante y le diagnosticó tres costillas rotas, luego de evaluar unas placas que tomó a este.

24. Eventualmente, el tratamiento del Demandante con el Dr. Martinó incluyó 5 bloqueos lumbares, 2 bloqueos cervicales y una infiltración.

25. El Dr. Martinó refirió al Demandante al Centro Médico de Puerto Rico.

26. En la Vista en su Fondo el Demandante no recordó detalles sobre este referido.

27. También quedó establecido que, como consecuencia del accidente, el Demandante ha recibido tratamiento psicológico, como se indica a continuación.

28. Comenzó con un referido de ACAA al Dr. Melvin de Humacao, para una evaluación. A raíz de esta, el Dr. Melvin le ordenó recibir 10 terapias ambulatorias.

29. El Demandante recibió las 10 terapias ambulatorias.

30. Además, alrededor de un año después de la fecha del accidente, el Demandante continuó su tratamiento psicológico en INSPIRA mediante citas mensuales, a cargo del Dr. Padró.

31. El Demandante fue a INSPIRA por iniciativa de su esposa, la Sra. González.

32. Además, en determinado momento de su tratamiento con

ISPIRA, el Dr. Padró refirió al Demandante al Hospital Panamericano, donde fue internado y recibió tratamiento para su depresión.

33. En el Juicio quedó establecido que el Demandante alega sufrir de depresión, pero que no consume medicamentos para atender la misma a pesar de haber representado que la misma es severa.

34. El Demandante expresó que, emocionalmente, no se ha sentido muy bien y se siente deprimido debido a que "...ya no puede realizar las cosas como acostumbraba".

35. Según el Demandante, no puede trabajar ni ayudar a su esposa.

36. En términos generales, los tratamientos del Demandante con la ACAA duraron aproximadamente dos años y medio después del accidente.

37. Sobre los tratamientos y terapias recibidos a raíz del accidente, el Demandante declaró sentirse deteriorado, deprimido y con ansiedad por no poder trabajar y ayudar como antes siempre lo hacía.

38. El Demandante también declaró que antes del accidente realizaba distintas labores en su empleo, tales como como mecánica, plomería y construcción, pero que "...por el accidente..." no podía realizar las mismas, "...ni ayudar a su esposa".

39. En torno a su condición física, en el Juicio el Demandante declaró que no siente bien y que todavía siente dolor en el área lumbar y cervical. También indicó que, en torno al área de las costillas se siente más aliviado.

40. El Demandante consume medicamentos diariamente para el dolor, incluyendo Neurontin, Tramadol y Flexeril.

41. El Demandante declaró que solo puede conducir un vehículo de motor por tramos cortos, ya que se le adormecen las piernas.

42. Durante el contrainterrogatorio del Demandante, la abogada de WIMAT, Lcda. López, le solicitó que levantara los brazos. Observamos como el Demandante levantó completamente su brazo izquierdo, mientras que alegó no poder levantar su brazo derecho más allá de la altura de los hombros.

43. Quedó establecido que el Demandante trabajó en la industria de la construcción, comenzando en el año 2000, con la compañía *Ica Miramar*. Luego de ello, el Demandante trabajó con *LM Waste* – su patrono al momento de ocurrir el accidente - del 2002 hasta el 26 de agosto de 2013.

44. Como empleado de *LM Waste*, el Demandante generaba un salario de $26,000.00 anuales.

45. El Demandante alegó haber perdido su trabajo en dicha empresa como consecuencia del accidente.

46. Sobre esto, se estableció que desde la fecha del accidente - 27 de agosto de 2013 - hasta la fecha del Juicio de este caso, el Demandante no volvió a trabajar.

47. Esto, a pesar de haber admitido en la Vista en su Fondo que no ha recibido ninguna indicación médica o especializada a los efectos que no puede volver a trabajar.

48. El Demandante también declaró que, desde el accidente, solo ha ido a buscar trabajo "... al Mall".

49. Nayda González Sánchez es la esposa del Demandante. La Sra. González declaró que tiene una hija con el Demandante, la que era menor de edad para la fecha del Juicio.

50. Alrededor de las 3:40 am del 27 de agosto de 2013, la Sra. González recibió una llamada de su esposo, relatándole lo sucedido.

51. Por tener a su hija menor y una sobrina en su casa no pudo dirigirse inmediatamente al lugar del accidente.

Luego de dejar a su hija y a su sobrina en la escuela, la *Sra.* González se dirigió al Hospital.

52. La Sra. González declaró que llegó al Hospital cerca de las 7:30 am, donde ya le habían atendido. No habló ni vio al médico hasta que dieron de alta a su marido.

53. En cuanto a los tratamientos recibidos en la ACAA por su esposo, el codemandante, la Sra. González declaró que no ha visto progreso.

54. En cuanto a la condición de su esposo, la Sra. González indicó que lo encuentra físicamente desmejorado y emocionalmente afectado.

55. La Sra. González entiende que la capacidad del Demandante para trabajar quedó limitada por el accidente.

56. Por ello, la Sra. González obtuvo un segundo trabajo, el que considera una carga adicional que ha trastocado su vida. Actualmente se encuentra trabajando.

57. En el plano económico-familiar, la Sra. González declaró que antes del accidente su esposo trabajaba y en el hogar tenían un "...presupuesto manejable". Sin embargo, declaró sentirse agobiada con la carga económica actual de su familia y lo difícil que ha sido manejar la situación.

58. Relató que la hija del matrimonio es asmática y que ha tenido que ir a "...tocar puertas..." para poder cubrir el deducible de los medicamentos. Para la fecha del Juicio la hija de los Demandantes tenía 15 años. Al momento del accidente tenía 10 años.

59. En el plano personal, la Sra. González declaró que el dolor de su esposo le causa preocupación y ansiedad. Cada vez que tiene oportunidad para comunicarse con él lo llama para saber cómo está.

60. El Juicio continuó con el testimonio del Dr. Cándido Martínez Mangual, testigo de los Demandantes.

61. **El Dr. Martínez Mangual es fisiatra y evaluó al Demandante el 11 de julio de 2015.** Plasmó sus hallazgos y conclusiones en el Informe Médico, en cual - luego de realizar un examen físico al Demandante - **diagnosticó los siguientes hallazgos: Esguince cervical; Tendinitis del tendón supraespinoso y bicipital hombro derecho; Miositis del pectoral mayor lado derecho; Trauma a costillas en el aspecto anterior del tórax, lado derecho; Costocondritis lado derecho; y, Esguince lumbar.**

62. Además, el Dr. Martínez Mangual opinó que el tratamiento recibido por el Demandante del Dr. Martinó - en lo concerniente al bloqueo cervical - no estaba bien indicado. También opinó el Dr. Martínez Mangual que la infiltración de músculo practicada por dicho galeno al Sr. Colon fue adecuada.

63. Para determinar la existencia de algún grado de impedimento del Demandante como consecuencia del accidente, el Dr. Martínez Mangual utilizó las guías de la Asociación Médica Americana.

64. El **Dr. Martínez Mangual concluyó que, al sumar el impedimento cervical de 1%, el del hombro derecho de 2%, 1% de Costocondritis y el síndrome lumbar de 2%, arrojó un 6% de impedimento**.

65. El Dr. Martínez Mangual no asignó porcentaje de incapacidad a la condición emocional alegada por el Demandante por no tener la información indicada para evaluarla.

66. Con la excepción del área de hipoestesia en el aspecto medial de la planta del pie izquierdo del Demandante, las demás **condiciones mencionadas en el Informe del Dr. Martínez Mangual están directamente relacionadas con el accidente en cuestión**.

67. El Dr. Martínez Mangual opinó que el Demandante no debe – ni puede - desempeñarse en oficios que requieran una carga física excesiva.

68. A preguntas de la Lcda. López, el Dr. Martínez Mangual expresó que el Sr. Colón podría ejercer labores de oficina, pero que ese análisis y recomendaciones correspondería a un perito vocacional. Indicó además que cualquier condición degenerativa preexistente del Demandante era irrelevante para sus hallazgos, ya que esta(s) no produce(n) dolor.

69. A preguntas del abogado de *Eliminex* y su aseguradora, Lcdo. Santaella, el Dr. Martínez Mangual explicó que la miositis o "espasmo" es el resultado de dolor y su tratamiento depende de la causa. Añadió a esto que los bloqueos administrados por el Dr. Martinó al Demandante no eran necesarios, ya que este no presentaba un cuadro de radiculopatía.

70. Además, el Dr. Martínez Mangual declaró que obvió el proceso de citar las guías y las tablas relacionadas con su Informe por entender que es algo tan estándar que no creyó necesario citarlas.

71. En el Juicio declaró el Ingeniero Berlín Ng Cortinas, quien fue cualificado como perito de *Eliminex* y cuya encomienda en el caso fue analizar las razones por las cuales se desprendió la capota de la Ford Ranger, basando su testimonio en su Informe Pericial del 11 de julio de 2O17.

72. El ingeniero Ng Cortinas realizó una inspección el I de julio de 2016 de la capota desprendida, para obtener un perfil completo de esta. Además, realizó un análisis estructural de los tornillos que esta debió haber tenido.

73. El ingeniero Ng Cortinas indicó que no pudo evaluar la calidad de los tornillos ni tuercas instaladas en la capota al momento de los hechos, por no estar disponibles.

74. Luego de ello, el 15 de julio de 2016, el ingeniero inspeccionó la Ford Ranger de la que se desprendió la capota el día del accidente.

75. El ingeniero Ng Cortinas declaró que, de las fotos contenidas en las páginas 6 y 7 del Exhibit Núm. 2, surge el desgaste de los agujeros y no se desprende ningún indicio de desgarre.

76. **Concluyó el ingeniero Ng Cortinas que el desprendimiento de la capota del vehículo Ford Ranger tablilla 898727 ocurrida el día 27 de agosto de 2013, fue causado por la instalación incorrecta y/o deficiente de la compañía encargada de así hacerlo, al no utilizar los aditamentos recomendados por el fabricante de la capota y, en su lugar, utilizar tornillos incorrectamente instalados, tornillos de baja calidad y tornillos no comerciales ni industriales, según requeridos.**

77. El juicio [continuó] con el testimonio del Sr. Juan M. Iribas Ramos, propietario de la compañía *Eliminex.*

78. *Eliminex* se dedica a la prestación de servicios de control de plagas en el comercio. Su operación data de los años 1997 a 1998 aproximadamente; contando con 7 empleados al momento del Juicio.

79. Para prestar servicios alrededor de la Isla, *Eliminex* cuenta con unos 10 vehículos tipo *pickup* para que sus empleados puedan trasladarse con los equipos de fumigación.

80. El Sr. Iribas Ramos es el encargado de asignar los vehículos a sus empleados, quienes pueden llevarse el vehículo asignado a sus casas.

81. Antes de asignar los vehículos, el Sr. Iribas Ramos los equipa con cajas de herramientas, capotas y los materiales necesarios, según el estándar de la industria.

82. *Eliminex* siempre contó con los servicios de *WIMAT* para la

compra e instalación de las capotas en los vehículos de su compañía.

83. La capota desprendida que causó el accidente objeto de este caso fue instalada en las facilidades de *WIMAT*, por personal de *WIMAT*.

84. **El Sr. Iribas Ramos declaró que nunca fue orientado sobre el mantenimiento que había que darle a la capota** y que, luego de ser instalada la capota, solo verificaron que su compuerta y la de la Ranger abrieran correctamente.

85. A preguntas de su abogado el Lcdo. Santaella, **el Sr. Iribas Ramos indicó que no recibió ningún tipo de instrucción adicional luego de ser instalada la capota**.

86. A preguntas de la abogada de *WIMAT* y *Universal* la Lcda. López, el Sr. Iribas Ramos indicó que, además de la guagua objeto de la controversia, posee cuatro vehículos modelo Ford F-150 que cuentan con capotas instaladas por *WIMAT*.

87. *WIMAT* también ha instalado cajas de herramientas en los vehículos de *Eliminex*, con excepción de la Ford Ranger eje de la controversia de autos.

88. El desprendimiento de la capota ocurrió a unos dos años de haberse instalado la capota desprendida.

89. En el juicio también declaró el perito de los Demandantes, Ingeniero Juan José Díaz Soultaire quien, luego de ser cualificado como perito, declaró que se le encomendó determinar la causa del desprendimiento de capota objeto del accidente.

90. El ingeniero Díaz Soultaire preparó el Informe identificado como Exhibit Número 4 de los Demandantes, en el que concluyó que podía percibir el desgaste en los agujeros de instalación y anclaje de la capota.

91. Indicó que, al identificar múltiples perforaciones en la Ford Ranger en el área de instalación, pudo inferir que la capota había sido removida y reinstalada.

92. Además de lo anterior, declaró el Ingeniero Díaz Soultaire que concluyó que el método de anclaje de la capota al indicado vehículo - como demuestran las fotos tomadas por él - no fue el adecuado; y que la causa de la separación y desprendimiento de la capota de la Ford Ranger el día del accidente se debió al cotejo y mantenimiento inadecuado de la capota instalada por el personal de *Eliminex*.

93. A preguntas del Lcdo. Santaella, el Ingeniero Díaz Soultaire indicó que en *WIMAT* no tenían un archivo completo de los trabajos realizados.

94. Además, declaró que dos métodos de instalación de las capotas LEER aceptables para el fabricante es el instalarlas con abrazaderas o tornillos, doble arandela y tuercas de seguridad.

95. El ingeniero Díaz Soultaire expresó que solicitó a *WIMAT* el manual del fabricante de la capota y que éstos no se lo produjeron.

96. También aclaró desconocer el grado los tornillos utilizados por *WIMAT* al instalar la capota, ni si *WIMAT* siguió las recomendaciones del fabricante al instalarla.

97. El Ingeniero Díaz Soultaire especificó que inspeccionó el vehículo Ford Ranger el 11 de noviembre de 2017, unos cuatro años después de haber ocurrido el accidente.

98. A preguntas de la Lcda. López, el Ingeniero Díaz Soultaire expresó que el vehículo Ford Ranger que tenía la capota instalada no coincide en la orden de capota con el vehículo del Informe preparado por *RG Adjusters*.

99. También señaló que inspeccionó la capota en la propiedad del Sr. Iribas Ramos y no le entrevistó.

100. El Ingeniero Díaz Soultaire reiteró que se percibía un patrón de desgaste de los agujeros donde estaban

instalados los tornillos de anclaje de la capota desprendida.

101.　Por recomendación de LEER, el manufacturero de la capota, los tornillos a utilizarse en su instalación son los de grado 5 con arandela y tuerca de 1". El manufacturero también recomienda inspeccionar mensualmente la instalación de la capota para verificar su ajuste.

102.　El Juicio continuó con el testimonio del Sr. Jorge Rodríguez Suárez, perito en lucro cesante contratado por los Demandantes. Su encomienda fue *evaluar* la existencia o no de lucro cesante del Demandante en el presente caso y calcular el mismo según el estándar utilizado en la industria.

103.　Expresó el Sr. Rodríguez Suárez que se le sometieron los documentos que entendió necesarios para la preparación de su informe y los utilizó en el mismo, el que está compuesto de tres partes. Estas consisten en: parte narrativa, tablas de trabajo y anejos.

104.　Su reporte es el Informe del 7 de marzo de 2016, donde presenta el resultado de su análisis y cálculo del lucro cesante sufrido por los Demandantes, Daniel Colón González y Nayda González Sánchez.

105.　El Sr. Rodríguez Suárez explicó el contenido de su informe y el análisis que utilizó para determinar el lucro cesante del Demandante.

106.　Explicó lo determinado en las dos hojas de trabajo en las que calculó el lucro cesante del Demandante a raíz del accidente. Según el Sr. Rodríguez Suárez, concluyó lo siguiente: Hoja de trabajo 1, la cual suma $419,648 asumiendo que el Demandante no podrá volver a trabajar; y la Hoja de trabajo 2 que suma $222,955 asumiendo que el Demandante podrá volver a trabajar.

107.　Continuó el juicio con el testimonio del Dr. Ernesto Pérez Cartagena y luego de un *voir dire* extenso, este fue cualificado como perito en Rehabilitación Vocacional <u>de manera condicionada</u>.

108.　El Dr. Pérez Cartagena indicó que su encomienda consistió en emitir una opinión, desde el punto de vista ocupacional, si el Demandante puede volver a trabajar y de ser así, cuándo y que tipo de trabajo este podrá ejercer.

109.　Explicó el Dr. Pérez Cartagena que para llegar a su conclusión realizó lo siguiente: entrevistó y observó al Demandante, estudió la evidencia médico-legal provista y realizó un análisis del "*Cuestionario de Rasgos Ocupacionales*" (CRO) administrado por él al Demandante.

110.　El Dr. Pérez Cartagena plasmo sus hallazgos y opinión en su "Informe de Consulta Vocacional", en el que concluyó que, según él, el Demandante no reúne los requisitos físicos ni mentales para poder trabajar.

111.　A preguntas de la Lcda. López, el Dr. Pérez Cartagena señaló que el CRO está basado en el Sistema de Clasificación Ocupacional Federal. De acuerdo al doctor, el CRO no fue solamente preparado por él, sino que contó con la colaboración de colegas en la elaboración de este. El documento no está encuentra firmado por el Demandante. Tampoco utilizó prueba psicométrica alguna al evaluar al Demandante, ni pruebas estandarizadas para evaluar la capacidad ocupacional de este.

112.　El Dr. Pérez Cartagena no auscultó los potenciales oficios que el Demandante podría ejercer basado en su preparación académica. Tampoco indagó en el mercado laboral sobre empleos disponibles que sean compatibles con la capacidad del Demandante.

113.　El CRO preparado por él no incluyó, ni consideró acomodo razonable ni <u>*la posibilidad*</u> de un acomodo razonable de trabajo para el Demandante.

114. Además, los documentos evaluados por el Dr. Pérez Cartagena indican o expresan que el Demandante no puede trabajar ni que esté incapacitado para volver a trabajar.

115. A preguntas del Lcdo. Santaella, el Dr. Pérez Cartagena indicó que no buscó alternativas de trabajo para el Sr. Colón González debido a que entiende que éste no estaba apto para trabajar por lo que, según él, el Demandante no debe someterse a ningún proceso de rehabilitación.

116. Asimismo, el Dr. Pérez Cartagena no consideró las incongruencias que surgen entre el CRO y un Informe Psiquiátrico Forense preparado por el Dr. Ramón O. Fortuño Ramírez. Tampoco consideró las incongruencias que hay entre el Informe del Dr. Fortuño y el Estimado de Capacidad Funcional-Mental preparado por el Psicólogo Forense Dr. Padrón Rodríguez.

117. En su Informe el Dr. Pérez Cartagena aseveró que ACAA no autorizó al Demandante regresar a trabajar; a pesar que esta determinación no corresponde a la ACAA, sino al Fondo del Seguro del Estado.

118. El Dr. Pérez tampoco administró ningún tipo de prueba al Demandante para determinar si este podía realizar trabajos sedentarios.

119. El 16 de octubre de 2018 continuó el Juicio con el testimonio del Sr. Ellie Pagán Meléndez, testigo de *Eliminex*, la parte demandada/tercera demandante.

120. Expresó el Sr. Pagán Meléndez que actualmente se dedica a la fumigación con su propia compañía y que anteriormente trabajó con *Eliminex Pest Control* por 10 años. En *Eliminex* fungió como Técnico y luego Supervisor.

121. Relató el Sr. Pagán Meléndez que el 27 de agosto de 2013, mientras se dirigía Salinas y al pasarle un camión, comenzó a sentir una vibración en la Ford Ranger.

122. Indicó que en la fecha de l[a] ocurrencia del accidente se percató que la capota comenzó a deprenderse hasta que eventualmente se desprendió completamente del vehículo, cayendo la misma en la carretera.

123. Señaló que, luego del desprendimiento, le dijo al empleado que le acompañaba que moviera el vehículo en lo que se dirigía hacía la capota. Entonces ocurre el choque del Demandante con la capota desprendida.

124. El Sr. Pagán informó que *Eliminex* le asignó el vehículo relacionado con el accidente cuando era Supervisor y que, mientras lo utilizó, no experimentó problemas con este.

125. El Sr. Pagán también declaró que, tan pronto culminaba sus labores, iba a su casa y lo estacionaba frente a esta.

126. Dijo el Sr. Pagan que, después de instalada, la capota no fue removida por él.

127. A preguntas del Lcdo. Santiago, abogado de los Demandante, en contrainterrogatorio, el Sr. Pagán confirmó que no se trató de un desprendimiento súbito de la capota y se mantuvo conduciendo la Ford Ranger a pesar de haberse dado cuenta de lo que estaba pasando.

128. A preguntas de la Lcda. López en contrainterrogatorio, el Sr. Pagán señaló que los vehículos asignados pernoctaban en las casas de los empleados y que, cuando le decían repórtate a la oficina, él iba a esta.

129. Además, dijo el Sr. Pagán. que el encargado del mantenimiento de los vehículos y quien tomaba las decisiones sobre los mismos era el Sr. Juan Iribas Ramos, dueño de *Eliminex*.

130. Así concluyó el desfile de prueba en el caso y quedó

sometido.[12] (Énfasis nuestro).

A tales efectos, **el TPI impuso a los apelantes el 40% de la responsabilidad de los daños causados a los apelados**. En específico, condenó a *WIMAT* y *Universal* [aquí apelantes] y a *Eliminex* al pago global de $195,622.00.

En cuanto al señor Colón González, se fijaron las siguientes partidas: $70,000.00 por los daños físicos, visita y estadía en la Sala de Emergencia el día del accidente, placas, exámenes y visitas médicas relacionadas; $7,500.00 por las 25 terapias físicas; $24,000.00 por el impedimento parcial permanente de un 6% de las funciones fisiológicas generales; $17,500.00 por las angustias mentales; y $64,122.00 en concepto de lucro cesante.

Por otro lado, se le concedió a la señora González Sánchez una indemnización de $12,500.00 por sus sufrimientos y angustias mentales.

En desacuerdo, el **22 de octubre de 2021** la parte apelante acude ante nos mediante el presente recurso de *Apelación,* y le atribuye al TPI los siguientes errores:

1) *Erró el TPI al concluir que la parte tercera demandada incurrió en un acto negligente y descartar que la causa eficiente por la cual se desprendió la capota que causó los daños obedeció a un patrón de desgaste por la negligencia de Eliminex, dueño del vehículo de motor por falta de mantenimiento y no aplicar la doctrina de absorción de culpas.*

2) *Erró el Tribunal de Primera Instancia en la indemnización concedida a la parte apelada por daños físicos, angustias mentales y lucro cesante por resultar en una sumamente excesiva y/o especulativa.*

3) *Erró el TPI en no reducir de la indemnización concedida la exención provista por la Ley de Protección Social por Accidentes de Automóviles.*

-II-

A.

Al revisar una determinación de un tribunal de menor jerarquía, **los tribunales tenemos la tarea principal de auscultar**

---

[12] *Id.*

**si se aplicó correctamente el derecho a los hechos particulares del caso**.[13] Como regla general, los foros apelativos no debemos intervenir con las determinaciones de hechos de los tribunales de primera instancia, su apreciación sobre la credibilidad de los testigos y el valor probatorio conferido a la prueba presentada en sala, pues solo contamos con *"récords mudos e inexpresivos"*.[14] Lo anterior, se fundamenta en la premisa de que el foro primario es quien tiene la oportunidad de escuchar a los testigos declarar y apreciar su *"demeanor"*.[15] Sin embargo, **la norma de deferencia antes esbozada encuentra su excepción y cede** cuando la parte promovente demuestra que: "*[h]ubo un **craso abuso de discreción o que el tribunal actuó con prejuicio y parcialidad**, o que se equivocó en la interpretación o aplicación de cualquier norma procesal o de derecho sustantivo, y que nuestra intervención en esa etapa evitará un perjuicio sustancial"*.[16]

Por discreción se entiende el *"tener poder para decidir en una forma u otra, esto es, para escoger entre uno o varios cursos de acción"*.[17] No obstante, "*el adecuado ejercicio de la discreción está inexorable e indefectiblemente atado al concepto de la razonabilidad"*.[18] A esos efectos, el Tribunal Supremo de Puerto Rico ha enumerado situaciones que constituyen un abuso de discreción:

> *[c]uando el juez, en la decisión que emite, no toma en cuenta e ignora, sin fundamento para ello, un hecho material importante que no podía ser pasado por alto; cuando por el contrario el juez, sin justificación y fundamento alguno para ello, le concede gran peso y valor a un hecho irrelevante e inmaterial y basa su decisión exclusivamente en el mismo; o cuando, no obstante considerar y tomar en cuenta todos los hechos materiales e importantes y descartar los irrelevantes, el juez livianamente sopesa y calibra los mismos.*[19]

---

[13] *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 770 (2013).
[14] *Id.*, págs. 770-771; *SLG Rivera Carrasquillo v. AAA*, 177 DPR 345, 356 (2009); *Serrano Muñoz v. Auxilio Mutuo*, 171 DPR 717, 741 (2007).
[15] *Colón v. Lotería*, 167 DPR 625, 659 (2006).
[16] *Trans-Oceanic Life Ins. v. Oracle Corp.*, 184 DPR 689, 709 (2012). (Énfasis nuestro).
[17] *García v. Asociación*, 165 DPR 311, 321 (2005).
[18] *Id.*
[19] *Ramírez v. Policía de PR*, 158 DPR 320, 340-341 (2002).

En cambio, si la actuación del tribunal no está desprovista de base razonable, ni perjudica los derechos sustanciales de una parte, debe prevalecer el criterio del juez de instancia a quien corresponde la dirección del proceso.[20] En ese sentido, las conclusiones de derecho son revisables en su totalidad por los tribunales apelativos.[21]

Ahora bien, **la norma de deferencia antes esbozada no es de aplicación a la evaluación de la prueba pericial y documental**. En lo que respecta a las conclusiones de hecho basadas en prueba pericial o documental, los foros revisores nos encontramos en igual posición que los tribunales sentenciadores para apreciarla y adoptar nuestro propio criterio.[22] Incluso, podemos descartarla, aunque sea técnicamente correcta.[23]

**B.**

Según la normativa antes expuesta, los tribunales apelativos, de ordinario, aceptan *"como correctas las determinaciones de hechos de los tribunales de instancia, al igual que su apreciación sobre la credibilidad de los testigos y el valor probatorio de la prueba presentada en sala".*[24] A pesar de ello, en ocasiones, la deferencia al arbitrio del juzgador de los hechos no es absoluta.[25] De manera, que:

> *[a]unque alguna prueba sostenga las determinaciones de hechos del tribunal, si de un análisis de la totalidad de la evidencia este Tribunal queda convencido de que se cometió un error, como cuando las conclusiones están en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida, las consideraremos claramente erróneas.*[26]

Por otro lado, en cuanto a las determinaciones de hecho y conclusiones de derecho, la Regla 42.2 de Procedimiento Civil

---

[20] *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 434-435 (2013); *Sierra v. Tribunal Superior*, 81 DPR 554, 572 (1959).
[21] *Dávila Nieves v. Meléndez Marín, supra*, pág. 770.
[22] *González Hernández v. González Hernández*, 181 DPR 746, 777 (2011); *Arrieta v. De la Vega*, 165 DPR 538, 551 (2005).
[23] *Id.*
[24] *Dávila Nieves v. Meléndez Marín, supra*, pág. 771.
[25] *Id.*
[26] *Id.*, pág. 772.

apunta que: *"[l]as determinaciones de hechos basadas en testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de las personas testigos"*.[27]

Dicho de otro modo, las determinaciones de hechos basadas en la credibilidad conferida por el juzgador a los testigos que declaren ante sí merecen gran deferencia.[28] Por tanto, nuestra intervención con la evaluación de la prueba testifical procede únicamente cuando un análisis integral de la misma *"nos cause una insatisfacción o intranquilidad de conciencia tal que estremezca nuestro sentido básico de justicia"*.[29] De ahí, que nuestro reglamento establece que cuando una parte señale algún error relacionado con la suficiencia de la prueba testifical o la apreciación errónea de la misma, deberá someter una transcripción, exposición estipulada o narrativa de la prueba.[30]

En cuanto a la evaluación y suficiencia de la prueba, la Regla 110 de Evidencia establece los principios que el juzgador deberá evaluar a la hora de determinar cuáles hechos quedaron establecidos.[31] En lo que nos concierne, la mencionada regla preceptúa que:

> (A) *El peso de la prueba recae sobre la parte que resultaría vencida de no presentarse evidencia por alguna de las partes.*
> (B) *La obligación de presentar evidencia primeramente recae sobre la parte que sostiene la afirmativa en el asunto en controversia.*
> (C) *Para establecer un hecho, no se exige aquel grado de prueba que, excluyendo posibilidad de error, produzca absoluta certeza.*
> (D) *La evidencia directa de una persona testigo que merezca entero crédito es prueba suficiente de cualquier hecho[.]*
> (E) *[...]*

---

[27] 32 LPRA Ap. V, R. 42.2.
[28] *SLG Rivera Carrasquillo v. AAA, supra,* pág. 356.
[29] *Rivera Menéndez v. Action Service,* 185 DPR 431, 444 (2012).
[30] Regla 19 (A) del Reglamento del Tribunal de Apelaciones, 4 LPRA Ap. XXII-B, R. 19 (A). Véanse, además, Reglas 19 (B), 20, 76 (A) y (E).
[31] 32 LPRA, Ap. VI, R. 110.

> *(F) En los casos civiles, la decisión de la juzgadora o el juzgador se hará mediante la preponderancia de la prueba a base de criterios de probabilidad[.]*[32]

En otras palabras, le corresponde al tribunal determinar si la prueba desfilada es suficiente para establecer la veracidad de los hechos alegados.[33] Así las cosas, no basta con formular meras alegaciones o teorías, pues estas no constituyen prueba.[34] Respecto al valor probatorio que le otorgarán los tribunales a los testimonios periciales, la Regla 702 de Evidencia señala que:

> *[e]l valor probatorio del testimonio dependerá, entre otros, de:*
> *(A) si el testimonio está basado en hecho o información suficiente;*
> *(B) si el testimonio es el producto de principios y métodos confiables;*
> *(C) si la persona testigo aplicó los principios y métodos de manera confiable a los hechos del caso;*
> *(D) si el principio subyacente al testimonio ha sido aceptado generalmente en la comunidad científica;*
> *(E) las calificaciones o credenciales de la persona testigo, y*
> *(F) la parcialidad de la persona testigo.*[35]

La citada regla establece una serie de factores que inciden sobre el valor probatorio del testimonio pericial, cuyo fin último es ayudar al juzgador a entender determinada prueba o hecho en controversia.[36] De modo, que: *"el juzgador de hechos no está obligado a aceptar las conclusiones de un perito. Por lo tanto, si luego de aquilatar el testimonio pericial, el juzgador concluye que no merece credibilidad, este tiene la facultad de rechazarlo".*[37]

### c.

En nuestra jurisdicción la responsabilidad civil por actos u omisiones culposas o negligentes extracontractuales se rige por el Artículo 1802 del Código Civil.[38] Esta disposición establece que

---

[32] *Id.*

[33] *Belk v. Martínez,* 146 DPR 215, 231 (1998).

[34] *UPR v. Hernández,* 184 DPR 1001, 1013 (2012); *Pereira Suárez v. Jta. Dir. Cond.,* 182 DPR 485, 510 (2011).

[35] 32 LPRA, Ap. VI, R. 702.

[36] E. Rivera García, *El valor del testimonio pericial en los procesos judiciales,* 47 Rev. Jur. U. Inter. P.R. 87, 99-100 (2013).

[37] *Id.*, pág. 101.

[38] Art. 1802 del Código Civil de Puerto Rico, 31 LPRA ant. sec. 5141. Considerando que los actos objeto de controversia surgieron durante la vigencia del anterior Código Civil de 1930, analizaremos los errores planteados a la luz de dicha legislación y su jurisprudencia interpretativa. Esto de conformidad con el Art. 1812 del Código Civil de 2020, 31 LPRA sec. 11717.

quien por acción u omisión cause daño a otro, mediando culpa o negligencia, viene obligado a reparar el daño causado.[39] El propósito de la ley es proveer a todo aquel que sufra daño un medio de resarcimiento contra aquellos que no ejercen el debido cuidado en sus actuaciones. El artículo añade que la imprudencia concurrente del perjudicado no exime de responsabilidad, pero conlleva la reducción de la indemnización.[40]

En materia de responsabilidad civil extracontractual, quien por acción u omisión cause daño a otro, interviniendo cualquier género de culpa o negligencia, vendrá obligado a reparar el daño ocasionado.[41] Esta doctrina reconoce que toda acción sobre responsabilidad por daños y perjuicios procede únicamente si concurren los siguientes elementos: (1) una acción u omisión culposa o negligente; (2) la producción de un daño real; (3) un nexo causal entre el daño y la conducta culposa o negligente.[42]

Conforme dispone nuestro estado de derecho vigente, **la culpa o la negligencia consiste en la falta de cuidado al no anticipar o prever las consecuencias de un acto, tal y como lo haría una persona prudente y razonable en iguales circunstancias**.[43] De ese modo, la exigencia de la normativa requiere que la actuación se emplee con un grado de cuidado, diligencia, vigilancia y debida precaución.[44] De ahí a que la previsibilidad sea parte fundamental de la responsabilidad por culpa o negligencia.[45] El grado de previsibilidad en cada caso varía y dependerá del estándar de conducta que sea aplicable.[46]

---

[39] *Cintrón Adorno v. Gómez*, 147 DPR 576, 598 (1999).
[40] *García v. ELA,* 163 DPR 800, 809 (2005).
[41] 31 LPRA ant. sec. 5141.
[42] *Id.*; *Nieves Díaz v. González Massas,* 178 DPR 820, 843 (2010).
[43] *Nieves Díaz v. González Massas,* pág. 844.
[44] *Monllor v. Soc. de Gananciales*, 138 DPR 600, 604 (1995).
[45] *Colón Chévere v. Class Otero*, 196 DPR 855, 864 (2016); *Elba ABM v. UPR,* 125 DPR 294, 309 (1990).
[46] *Colón Chévere v. Class Otero,* supra; *Hernández v. Televicentro,* 168 DPR 803, 831 (2006).

El deber de cuidado exigible consiste en la obligación de todo ser humano de anticipar el peligro de ocasionar daños cuya probabilidad es razonablemente previsible.[47] La determinación de si hubo negligencia se basa en la consideración objetiva de lo que hubiese podido anticipar o prever bajo idénticas circunstancias un hombre prudente y razonable.[48] Este deber de anticipar y evitar la ocurrencia de un daño, cuya probabilidad es razonablemente previsible, no se extiende a todo riesgo posible.[49] Lo esencial es que se pueda prever en forma general las consecuencias de determinada acción o inacción.[50]

El otro factor por considerarse ante la adjudicación de responsabilidad civil extracontractual es la **existencia de un nexo causal entre el acto culposo o negligente y el daño sufrido**. Para establecer este elemento, el Tribunal Supremo de Puerto Rico se ha regido por el principio de **causalidad adecuada** que establece que *"[n]o es causa toda condición sin la cual no se hubiera producido el resultado, sino la que ordinariamente lo produce según la experiencia general"*.[51] Además, es necesario que el daño pueda preverse dentro del curso normal de los acontecimientos.[52] Asimismo, en lo que toca al elemento del nexo causal, reiteramos que **existirá tal conexión si, al mirar el daño en retrospectiva, este parece ser la consecuencia razonable, común y natural de la acción u omisión imputada al autor demandado**.[53] Es esa relación directa la que permite concluir que el acto torticero imputado es la causa adecuada del daño reclamado.[54]

---

[47] *López v. Dr. Cañizares*, 163 DPR 119, 132 (2004); H. M. Brau del Toro, *Los Daños y Perjuicios Extracontractuales en Puerto Rico,* 2da ed., PR, Publicaciones JTS, Inc., 1986, Vol. I, pág. 184.
[48] *Id.*
[49] *López v. Dr. Cañizares*, 163 DPR, *supra,* a la pág. 133; *Montalvo v. Cruz,* 144 DPR 748, 756 (1998).
[50] *Id.*
[51] *Soc. de Gananciales v. Jerónimo Corp.*, 103 D.P.R. 127, 134 (1974).
[52] *Jiménez v. Pelegrina,* 112 D.P.R. 700, 704 (1982).
[53] *Montalvo v. Cruz,* 144 DPR 748 (1998), en las págs. 756-757.
[54] *Id.*

El propósito de utilizar criterios como el de causa adecuada o causa próxima es limitar la cadena de responsabilidad civil y evitar que se extienda a límites absurdos.[55] Este concepto de la causa postula, además, que la ocurrencia del daño que da base a la reclamación era previsible dentro del curso normal de los acontecimientos. Es decir, causa es la condición que ordinariamente produce el daño, según la experiencia general, y este nexo causal puede romperse ante la ocurrencia de un acto extraño.[56]

Siendo así, en *Arroyo López v. ELA*, nuestro Alto Foro Judicial de Puerto Rico expresó lo siguiente:

> *"[p]ara que exista relación causal, la acción u omisión tiene que ser idónea para producir el efecto operado; tiene que determinarlo normalmente. A fin de establecer esa vinculación de causa y efecto entre esos dos sucesos, tenemos que realizar un análisis retrospectivo de posibilidad. En vista de ello, no es suficiente que un hecho aparezca como condición de un evento, si regularmente no trae aparejado ese resultado. La causalidad esta necesariamente limitada por el ámbito de la obligación, pues es infinita la serie de daños que, en interminable encadenamiento pueden derivarse del incumplimiento de una obligación".[57]*

Por otro lado, bajo la doctrina de la causa adecuada, el daño ocasionado puede ser el resultado de la culpa o negligencia de dos o más personas.[58] Tal situación se ve presente cuando los cocausantes de un daño actúan independientemente uno del otro y por culpa o negligencia de ambos causan daño a un tercero.[59] Asimismo, ha quedado meridianamente claro que:

> *Para que dos o más de los actores sean responsables, la culpa o negligencia de éstos ha de ser la causa del daño. Se entenderá que hay relación causal, entre el acto u omisión de los distintos actores con el daño ocasionado, si están presentes los criterios de la doctrina de la causa adecuada. Por tanto, la causa adecuada del daño ha de ser la culpa o negligencia concurrente de los distintos actores. Expresado de otra manera, si los distintos actores no hubiesen sido negligentes, el daño no hubiese ocurrido."[60]*

---

[55] *Miranda v. E.L.A.*, 137 DPR 700 (1994).
[56] *Elba A.B.M. v. U.P.R.*, 125 DPR 294, 310 (1990).
[57] *Arroyo López v. ELA*, 126 DPR 682 (1990), en la pág.690.
[58] C. J. Irizarry Yunqué, *Responsabilidad Civil Extracontractual*, Panamericana Formas e Impresos S.A., 2009.
[59] *Id.*
[60] L. Cancel Méndez, *Doctrina de la Absorción de Culpas en la Responsabilidad Civil Extracontractual en Puerto Rico*, 38 2 RDPUC 243 (1999).

Siendo así, una vez el tribunal sentenciador determina la existencia de los daños alegados y la relación o nexo causal entre el daño y quien lo provoca, es decir, la parte demandada, procede entonces estimar a cuánto ascenderá la compensación monetaria que será adjudicada a favor de la parte perjudicada.

**D.**

Por otra parte, el Artículo 1802 del Código Civil, también incluye la doctrina de la negligencia comparada al establecer que "*la imprudencia concurrente del perjudicado no exime de responsabilidad, pero conlleva la reducción de la indemnización*".[61] Conforme esta doctrina "*la negligencia concurrente o contribuyente del demandante (y la asunción de riesgos por éste), sirve para mitigar, atenuar o reducir la responsabilidad pecuniaria del demandado, pero no para eximir totalmente de responsabilidad a éste*".[62] Ello requiere que el juzgador determine el monto de la compensación que corresponde al demandante y el por ciento de negligencia incurrida por cada parte y luego reduzca la indemnización del demandante, conforme a la distribución de la responsabilidad.[63] Para determinar la negligencia de cada parte es preciso hacer un análisis circunstancial del caso.[64]

Cuando se concluye que hay **negligencia comparada**, puede aplicar la doctrina de **absorción de culpas**. La doctrina de absorción de culpa se puede aplicar cuando existe negligencia comparada, particularmente cuando las actuaciones imprudentes del demandante fueron lo que lo colocó en una situación de peligro que causó daño.[65] Sin embargo, la aplicación de esta norma ocurre solo en instancias en las que existe una marcada e indisputable

---

[61] Art. 1802 del Código Civil de Puerto Rico, 31 LPRA ant. sec. 5141.
[62] *Quiñones López v. Manzano Pozas*, 141 DPR 139, 176 (1996).
[63] *Ramos Milano v. Walmart*, 168 DPR 112, 119 (2006); *Quiñones López v. Manzano Pozas*, 141 DPR 139 (1996), a la pág. 176.
[64] *Id.*, a la pág. 119.
[65] *Toro Lugo v. Ortíz Martínez*, 113 DPR 56 (1982).

desproporción entre la distribución de culpas del demandante y el demandado. Cuando esto ocurre, la distribución de negligencia con la mayor proporción absorbe la negligencia y responsabilidad en menor proporción de la otra parte.[66] De forma simplificada, aquél que haya sido negligente en mayor grado absorbe la culpa del otro, quedando este último libre de responsabilidad.[67]

Así, para que se ponga en práctica la doctrina, requiere una desproporción incuestionable de responsabilidad entre las partes. La diferencia entre los niveles de culpa debe ser preponderante, pero no se ha predispuesto un porciento exacto de culpas asignadas que inmediatamente active la doctrina. Por lo tanto, la aplicación de la doctrina ha quedado al arbitrio de los Tribunales, a los que, entonces, le corresponde determinar caso a caso qué grado o por ciento de responsabilidad representa uno tan ínfimo para ser absorbido por el mayor.[68] Esencialmente, queda pendiente a la discreción del juzgador el determinar si aplica a un caso determinado la doctrina de absorción de culpas y si la distribución de responsabilidad entre las partes la justifica.[69]

Sin embargo, **el uso de la doctrina de absorción de culpas se ha abandonado o se ha limitado en su aplicación en la mayoría de las jurisdicciones modernas. Esto se debe en gran medida a la implementación de la negligencia comparada, la que ha desplazado el uso de la doctrina de absorción de culpa, por ser percibida la primera como más acorde con nociones de justicia y equidad, al igual que más aplicable en los casos de concurrencia de culpas**.[70]

---

[66] *Cárdenas Maxán v. Rodríguez Rodríguez*, 125 DPR 702 (1990).
[67] L. Cancel Méndez, *Doctrina de la Absorción de Culpas en la Responsabilidad Civil Extracontractual en Puerto Rico, supra.*
[68] C. J. Irizarry Yunqué, *Responsabilidad Civil Extracontractual, supra.*
[69] *Id.*
[70] Cancel Méndez, op. cit.

A pesar de esto, la doctrina sigue presente en nuestro ordenamiento, pero su aplicación depende enteramente del ejercicio de discreción reservado para la judicatura.

**E.**

**La valoración del daño constituye un elemento fundamental en nuestro ordenamiento jurídico**.[71] El concepto daño comprende tanto pérdidas patrimoniales como no patrimoniales. Los daños patrimoniales incluyen el valor de la pérdida sufrida y la ganancia dejada de obtener por un acreedor.[72] Entre los daños no patrimoniales, están comprendidos los daños físicos y las angustias mentales. Se consideran angustias mentales indemnizables aquellos daños de carácter emocional, tales como estados de pesar, sufrimiento, angustia, dolor y ansiedad causalmente relacionados con un acto culposo o negligente.[73] Para que una reclamación de este tipo proceda, es imprescindible probar sufrimientos y angustias morales profundas y no bastaría una pena pasajera como base de la acción.[74]

El proceso de valoración de daños es uno de los ejercicios de la función judicial más complejos, puesto que implica adjudicar un valor monetario a un daño que solamente puede ser aprehendido en toda su extensión por quien lo sufre. Las prácticas judiciales reiteradas dan un marco de referencia adecuado para que los tribunales puedan hacer dicha gestión estimatoria con alguna uniformidad.[75] No obstante, como no existen casos exactamente iguales y cada uno depende de sus propias circunstancias al momento de valorizar los daños, está implícito un ejercicio de discreción guiado por el sentido de justicia del juzgador.[76] La tarea

---

[71] A. J. Amadeo-Murga, *El Valor de los Daños en la Responsabilidad Civil*, 2da Ed., Bosh Editor, 2012, pág. 19.
[72] Art. 1059 del Código Civil de 2020, 31 LPRA ant. sec. 3023.
[73] Elba ABM v. UPR, 125 DPR 294 (1990).
[74] Ramos Rivera v. ELA, 90 DPR 828 (1964).
[75] Herrera, Rivera v. SLG Ramírez-Vicéns, 179 DPR 774 (2010).
[76] *Rodríguez et al. v. Hospital et al.*, 186 DPR 889 (2012).

de valorar el daño lleva consigo cierto grado de especulación e involucra elementos subjetivos del juzgador, tales como la discreción y el sentido de justicia y conciencia humana.[77]

Ahora bien, **son los jueces de instancia los que están en mejor posición que los tribunales apelativos para hacer esta evaluación, toda vez que estos son los que tienen contacto directo con la prueba presentada**.[78] Por ello, los foros revisores guardaremos deferencia a las valorizaciones de daños que hagan los foros de primera instancia.[79] De esta forma, los tribunales apelativos no habremos de intervenir con la valoración de daños que realiza el foro primario, salvo cuando la cuantía concedida resulte ridículamente baja o exageradamente alta.[80] En este último caso, estamos obligados a examinar la prueba desfilada ante el foro de instancia y las cuantías otorgadas en casos similares resueltos anteriormente.[81]

Ciertamente, las indemnizaciones concedidas en casos anteriores constituyen un punto de partida y referencia útil para pasar juicio sobre las concesiones otorgadas por el foro primario; aun cuando no existen dos casos exactamente iguales y cada uno es distinguible según sus circunstancias particulares.[82] En todo caso, las compensaciones otorgadas en casos anteriores deben ajustarse a su valor presente. En vista de lo anterior, el Tribunal Supremo determinó lo siguiente:

> *Ante ello, nos vemos obligados a advertir a los jueces y las juezas sobre la importancia de detallar en sus dictámenes los casos que se utilicen como referencia o punto de partida para la estimación y valoración de daños y el cómputo realizado para establecer las cuantías que se concedan. Este llamado a los jueces y las juezas cobra importancia ante la necesidad imperante de instruir a las partes y a los miembros de la profesión jurídica en torno al método que se utiliza en ese difícil y angustioso proceso de estimar y valorar los daños.*

---

[77] *Santiago Montañez, et al. v. Fresenius Medical Care, et al.,* 195 DPR 476 (2016).
[78] *Herrera, Rivera v. SLG Ramírez-Vicéns, supra.*
[79] *Santiago Montañez, et al. v. Fresenius Medical Care, et al., supra.*
[80] *Id.*
[81] *Id.*
[82] *Rodríguez et al. v. Hospital et al., supra*, págs. 909-910; *Herrera, Rivera v. SLG Ramírez-Vicéns, supra*, pág. 785.

*Habida cuenta de que esa tarea lleva consigo cierto grado de especulación, **es forzoso explicar qué casos se utilizan como referencia y cómo las cuantías concedidas se ajustan en esos casos anteriores al caso que el tribunal tiene ante su consideración.**[83]* (Énfasis nuestro).

Siendo así, quien solicite modificar la cuantía concedida tendrá el peso de la prueba.[84] De este modo, la parte que solicita la modificación de la indemnización concedida por el foro de instancia deberá demostrar que en efecto existen circunstancias que así lo justifican.[85] Sin embargo, a pesar de que la tarea de valoración de daños puede generar múltiples criterios, tal tarea debe residir, dentro de lo posible, en el juicio del juzgador de los hechos, enmarcado dentro de un análisis de razonabilidad. De no existir algún error manifiesto, parcialidad o prejuicio en tal apreciación, no corresponde nuestra intervención.[86]

Por último, conforme al método establecido por nuestro Tribunal Supremo, al utilizar casos comparables, los tribunales vienen obligados a utilizar el cambio en el poder adquisitivo del dólar a través del tiempo para obtener el ajuste por inflación. El valor adquisitivo del dólar debe obtenerse del índice de precios al consumidor que prepara el Departamento del Trabajo y Recursos Humanos. Una vez obtenido el ajuste por inflación, se realiza un ajuste adicional por el crecimiento económico ocurrido entre el año del caso que se utiliza como referencia y el año cuando se dictó sentencia en el caso actual.

Por tanto, para calcular el valor adquisitivo del dólar se divide 100 entre el índice de precios al consumidor para el año en que se dictó sentencia en el caso utilizado como referencia. Luego, para actualizar esa cantidad y llevarla al año en que se dictó sentencia en caso actual, se divide el ajuste por inflación (obtenido del cálculo

---

[83] *Santiago Montañez, et al. v. Fresenius Medical Care, et al., supra*, pág. 493.
[84] *Meléndez Vega v. El Vocero de PR*, 189 DPR 123 (2013).
[85] *Id.*
[86] *Id.*

anterior), entre el valor adquisitivo del dólar para el año en que se dictó sentencia el caso actual.[87]

**F.**

El Artículo 1059 del Código Civil de 2020 establece que: *"[l]a indemnización de daños y perjuicios comprende no sólo el valor de la pérdida que haya sufrido, sino también el de la ganancia que haya dejado de obtener el acreedor".*[88] Citando a Manresa, el Tribunal Supremo ha señalado, en lo pertinente, que este artículo: *"provee una compensación cuando se impide a una persona aprovecharse de lo que le hubiera correspondido".*[89] Esta disposición preceptúa que una indemnización en daños y perjuicios no solo comprende el valor de la pérdida que haya sufrido la persona, sino que también la ganancia que esta haya dejado de percibir.[90]

Por *lucro cesante* debe entenderse *"[a]quella partida de daño que debe ser resarcida por concepto de la pérdida de ingresos ocasionada al perjudicado y la disminución de su capacidad productiva".*[91] De ahí, que el reclamante debe establecer que la interrupción y cese de sus ingresos fue a consecuencia de las actuaciones del demandado.[92] En otras palabras, el lucro cesante constituye *"una ganancia futura frustrada que con cierta probabilidad se esperaba".*[93] Así las cosas, *"sustituye los ingresos generados por el trabajo, que se han dejado de percibir por motivo de un acto culposo o negligente".*[94] Cabe señalar, que al estimar y valorizar la partida que habrá de ser concedida por concepto de lucro cesante, permea esencialmente un elemento de razonabilidad.[95]

---

[87] Véase, *Santiago Montañez v. Fresenius Medical, supra*, págs. 497-498.
[88] 31 LPRA ant. sec. 3023.
[89] *El Coquí Landfill v. Mun. Gurabo*, 186 DPR 688, 697 (2012).
[90] *PRFS v. Promoexport*, 187 DPR 42, 60-61 (2012).
[91] *SLG Rodríguez v. Nationwide*, 156 DPR 614, 623 (2002).
[92] *Id.*, págs. 623-624.
[93] *PRFS v. Promoexport*, supra, pág. 61.
[94] *Díaz v. Alcalá*, 140 DPR 959, 973 (1996).
[95] *Id.*, pág. 625.

Si bien *"los daños compensables en casos de lucro cesante se refieren a la ganancia neta insatisfecha por la conducta del demandado, no al ingreso bruto"*,[96] las ecuaciones matemáticas utilizadas en decisiones previas no constituyen una fórmula fija y rígida que deba aplicarse estrictamente en toda determinación de lucro cesante.[97] Además, al computar el lucro cesante se debe utilizar la expectativa de vida útil de la persona, es decir, lo que en verdad podía ganar hasta el momento en que terminara de ejercer su labor.[98]

Entre los elementos a ser considerados en la metodología para determinar el monto de la pérdida económica, nuestro Máximo Foro Judicial ha seguido lo siguiente:

1. *[…] [V]incula el concepto de lucro cesante a la dependencia económica al momento de la […] incapacidad.*
2. *[…] [T]oma como base los ingresos más recientes de la víctima y se reconoce la posibilidad de que estos aumenten. Los aumentos pueden ser a base de incrementos en los niveles de salario mínimo, aumentos en la escala de salarios a que está sujeta la persona y la experiencia histórica del ingreso de las personas en Puerto Rico. […] Un procedimiento aceptado es usar un número de años de la experiencia histórica que sea igual al número de años de vida útil que la víctima hubiera tenido si no hubiera ocurrido la […] incapacidad.*
3. *Para el estimado de vida útil se ha aceptado 65 años como edad límite. […].*

   *[…]*

5. *[…] [L]os ingresos perdidos antes de la fecha de la vista judicial […] no reciben ningún ajuste para reconocer que el valor del dinero depende del momento en que se recibe. Meramente se suman como un componente de la pérdida estimada.*
6. *A los ingresos que se estima se habrían de percibir desde la vista judicial en adelante […] se le calcula el valor presente. Es decir, que en este elemento del cálculo se reconoce que el valor del dinero depende del momento en que se recibe. Para computar el valor presente, se suman los ingresos futuros y el total se divide entre los años de vida útil que restan a la víctima desde la fecha de la vista judicial. El promedio se considera como si fuera una anualidad y se le calcula el valor presente de la anualidad utilizando una tasa de interés de 6%.*

   *[…]*

9. *La suma del lucro cesante pretérito y el lucro cesante futuro constituye el lucro cesante total al que tienen derecho los perjudicados.*[99]

---

[96] *El Coquí Landfill v. Mun. Gurabo*, supra, págs. 697-698.

[97] *SLG Rodríguez v. Nationwide*, supra, pág. 625.

[98] *Suro v. ELA*, 111 DPR 456, 461 (1981).

[99] R. Martínez Cuevas, *El Estimado del Valor del Lucro Cesante por Muerte o*

**G.**

La Administración de Compensaciones por Accidentes de Automóviles (ACAA), se creó mediante la *Ley de Protección Social por Accidentes de Automóviles* (Ley de la ACAA).[100] La corporación pública administra un sistema de seguro y de compensación por accidentes de tránsito con el fin de reducir a un mínimo los trágicos efectos económicos y sociales producidos por estos sobre la víctima, su familia y demás dependientes.[101] Así las cosas, provee servicios médico-hospitalarios, compensación y otros beneficios, entre ellos, pagos por incapacidad.[102] Si bien el estatuto no es uno de naturaleza laboral, como ley reparadora atiende un sinnúmero de escenarios, entre los que se encuentra el de un trabajador que quede inhabilitado para desempeñar sus labores como consecuencia de un accidente automovilístico.[103]

La Ley de la ACAA, *supra*, provee que: *"tendrá derecho a los beneficios que dispone [el estatuto] toda persona natural que sufra daño corporal, enfermedad o la muerte resultante de estas, como consecuencia del mantenimiento o uso por sí misma o por otra persona de un vehículo de motor como tal vehículo.[…]"*.[104] Para poder recibir los beneficios que provee la ACAA, el accidente deberá ser notificado a la corporación pública.[105] De ahí, que: *"[t]oda persona con derecho a reclamar un beneficio bajo [la ley], deberá radicar su reclamación con la [ACAA] […] dentro de los quince (15) días siguientes a la fecha de dicho accidente"*.[106]

---

*Incapacidad en Puerto Rico,* 64 Rev. Jur. U.P.R. 75, 83-85 (1995).
[100] Ley Núm. 138 de 26 de junio de 1968, según enmendada, 9 LPRA sec. 2051 *et seq. Véase*, además, 9 LPRA sec. 2060.
[101] *Whittenburg v. Col. Ntra. Sra. del Carmen*, 182 DPR 937, 966-967 (2011).
[102] *Id.*, pág. 967. *Véase*, 9 LPRA sec. 2054(1)(a).
[103] *Id.* En *Mercado Santini v. Tribunal Superior*, el Tribunal Supremo de Puerto Rico aclaró que era la CFSE quien primeramente viene obligada *"a pagar o prestar los servicios siempre que el accidente automovilístico sea también un accidente del trabajo"*. 101 DPR 523, 531 (1973). Sin embargo, según discutiremos más adelante, ello no priva al obrero de solicitar los beneficios que provee la ACAA.
[104] 9 LPRA sec. 2053. Véase, además, 9 LPRA sec. 2052(10).
[105] 9 LPRA sec. 2057(1).
[106] 9 LPRA sec. 2057(2).

Por otra parte, la Ley de la ACCA le provee un minúsculo alivio económico al causante de los daños, en aquellos casos donde la víctima ejercita una causa acción reclamando el resarcimiento de los daños sufridos. El estatuto en cuestión establece que:

*(2) Se eximirá de la aplicación del principio de responsabilidad a base de negligencia a toda persona que sea responsable, en virtud de un acto negligente de su parte, por daños o lesiones por los cuales se proveen beneficios bajo este capítulo. Dicha exención se limitará a:*

*(a) La cantidad de $1,000 por sufrimientos físicos y mentales incluyendo dolor, humillación y daños similares, y de*

*(b) la suma de $2,000 por concepto de otros daños o pérdidas no incluidas en (a).*

***(3) Toda persona a quien un tribunal declare en una acción civil responsable de haber causado por negligencia lesiones** por las cuales la víctima, sus sobrevivientes o cualquier otra persona tengan derecho a recibir beneficios o servicios médico-quirúrgicos y de hospitalización bajo este capítulo, **tendrá derecho a una reducción en la sentencia a ser impuesta por el tribunal hasta la cantidad indicada en esta sección.***

*(a) En cada caso en que aplique esta sección el tribunal deberá indicar separadamente el importe de la indemnización otorgada por daños debido a dolor y sufrimientos físicos y mentales y el importe de la indemnización otorgada por otras pérdidas.*

*(b) La reducción aplicable a daños por sufrimientos físicos y mentales será de $1,000.*

*(c) La reducción aplicable a daños y pérdidas por causas que no sean sufrimientos físicos y mentales será la suma de $2,000 o el importe de los beneficios totales pagados por la Administración, si dicho importe fuera mayor de $2,000.*

*(d) [...]*

*(e) Si la responsabilidad por los daños causados recae sobre dos o más personas, las reducciones que provee esta sección se deducirán sólo una vez. Las mismas se restarán de la sentencia total a pagarse por todos las partes. El tribunal determinará el importe de la reducción que aplicará a cada una de dichas partes.*[107]

En *Morales v. Lizarribar*, el Tribunal Supremo resolvió que el causante del accidente se puede acoger a las deducciones que provee la Ley de la ACAA, *supra*, independientemente de que la corporación pública provea o no los beneficios a la víctima.[108] Al respecto, dicho foro dispuso lo siguiente:

*[l]a parte recurrente argumenta que [...] la aplicación de los límites señalados en la [Ley de la ACAA] [...] está condicionada a que la Ley provea beneficios a favor de la víctima o sus beneficiarios. En otras palabras que el causante del accidente sólo podrá acogerse a las deducciones cuando la propia ley*

---

[107] 9 LPRA sec. 2058. Énfasis nuestro.
[108] *Morales v. Lizarribar,* 100 DPR 717, 724-726 (1972).

> *conceda beneficios por la partida que se desea deducir. [...].*
> *No estamos de acuerdo. La [Ley de la ACAA] [...] establece un relevo de responsabilidad por negligencia a favor del causante del accidente por los conceptos y límites que allí se indican a manera de deducciones: (1) sufrimientos físicos y mentales, $1,000.00 y (2) otros daños y pérdidas, $2,000.00, o el importe de los beneficios totales pagados por la Administración si dicho importe fuera mayor de $2,000.00.*
> ***La deducción** de $1,000.00 por sufrimientos mentales **no está condicionada meramente al caso de aquellas víctimas de accidentes que hayan recibido los beneficios que provee la ley, sino que se extiende a aquellas que aunque no se hayan acogido ni recibido los beneficios del sistema '[t]enga derecho a recibir beneficios o servicios médico-quirúrgicos y de hospitalización ...' bajo el mismo.** En el caso que consideramos, la víctima, aquí recurrente, sufrió 'hematomas, contusiones y abrasiones en el cuerpo 'como consecuencia de un accidente de automóviles. Como tal, pudo haber reclamado de la [ACAA] los servicios médicos, de hospitalización y otros beneficios que ofrece la Ley. [...]*
> *Resolvemos que la exención de $1,000.00 por concepto de sufrimientos mentales de la víctima de un accidente de automóviles es una automática que beneficia al causante del accidente. [...].*
> *[...]*
> ***Esta disposición, sin embargo, no excluye en forma alguna el derecho de la víctima o de sus beneficiarios a reclamar por la vía judicial y a base del principio de responsabilidad por culpa o negligencia. <u>Sólo reduce, por las cantidades antes señaladas, o el importe de los beneficios pagados por la Administración [...] si resultaren en una cantidad mayor, las sentencias que en su día imponga un tribunal por concepto de indemnización</u>. El exceso corresponderá, como hasta el presente ha correspondido, a la víctima y sus beneficiarios reclamantes.***[109]

Cónsono con lo anterior, el Alto Foro ha señalado que la deducción a favor del causante del accidente y/o su compañía aseguradora —por concepto de sufrimientos físicos y mentales— es de carácter mandatoria y automática.[110] Al mismo tiempo, *"[l]as exenciones y deducciones dispuestas por [la] ACAA deberán oponerse al obrero demandante en la vista en su fondo del pleito de daños".*[111] En *Urrutia v. AAA,*[112] nuestro Tribunal Supremo dispuso que la interpretación lógica del lenguaje de la Ley de la ACAA, *supra,* implicaba que:

> *[c]uando un reclamante no se acoge a dicho sistema, teniendo derecho a ello, le es oponible válidamente la cuantía mayor en*

---

[109] *Id.* Énfasis nuestro.
[110] *Canales Velázquez v. Rosario Quiles,* 107 DPR 757, 774 (1978); *Zeno Molina v. Vázquez Rosario,* 106 DPR 324, 330 (1977); *González v. Chávez,* 103 DPR 474, 477 (1975).
[111] *Administradora F.S.E. v. Maldonado,* 107 DPR 527, 529 (1978).
[112] *Urrutia v. AAA,* 103 DPR 643 (1975).

*gastos médico-hospitalarios incurrida fuera del sistema debiendo deducirse la suma total en exceso de $2,000.00. Concluir lo contrario sería dejar al arbitrio de un reclamante la fijación de indemnización por este concepto al poder optar, sin consecuencia jurídica alguna, el acudir a tratamiento ajeno al sistema de compensación social diseñado haciendo inoperante una de las deducciones fijadas en la ley. Resulta necesario que nuestras decisiones propicien la canalización de agravios y la obtención de remedios a través de los sistemas administrativos establecidos para toda la ciudadanía, descongestionando a los tribunales del proceso de dirimir controversias cuyas soluciones están previstas fuera del ámbito judicial.* [113]

**-III-**

A la luz de la normativa antes expuesta, procedemos a evaluar los errores señalados en el recurso ante nuestra consideración.

De entrada, la Sentencia apelada le impuso a la parte apelante, *WIMAT* y *Universal* un 40% de la responsabilidad de los daños causados y un 60% de la responsabilidad a *Eliminex* y *Seguros Múltiples.*

Para lograr un análisis adecuado de los señalamientos de errores de la parte apelante, discutiremos en primer orden el error señalado sobre el nexo causal y los daños.[114] Luego de ello, continuaremos con la discusión de los errores relativos a la valoración de los daños sufridos por los apelados y, en tercer lugar, la aplicación de las deducciones provistas por la Ley de la ACAA.[115] Veamos.

**En primer orden**, *WIMAT* arguye que el TPI incidió al determinar que incurrieron en un acto negligente, y descartar que la causa por la cual se desprendió la capota obedeció a un a patrón de desgaste por la negligencia de *Eliminex.*

Surge del expediente que —ante los testimonios de los peritos de la parte apelada— el juzgador de los hechos determinó que la instalación de la capota realizada por *WIMAT* fue defectuosa, ya que no se instaló acorde a las guías operacionales del fabricante; a ello,

---

[113] *Id.*, págs. 648-649.
[114] Señalamiento de error número 1.
[115] Señalamiento de error número 2 y 3.

*Eliminex* no le dio el mantenimiento adecuado, por lo que el TPI les atribuyó un 40% y 60% de negligencia respectivamente. Tal determinación resulta razonable y está sostenida por la evidencia que obra en el expediente de autos; razón por la cual, no cabe hablar de la doctrina de absorción de culpa. Por lo tanto, no se cometió el primer error señalado y se confirma el 40% de responsabilidad impuesto a la parte apelante.

**En segundo orden**, nos corresponde determinar si el TPI incidió en la valoración de los daños. En atención a esto, nuestro Máximo Foro Judicial ha resuelto que, quien intente modificar la cuantía concedida, tendrá el peso de la prueba. De este modo, la parte que solicita la modificación de la indemnización deberá demostrar que, en efecto, existen circunstancias que así lo justifican. A modo de recapitular, indicamos las partidas concedidas a la parte apelada:

> ***Daniel Colón González:*** *[p]or todos sus daños $183,122.00 desglosados en las siguientes partidas*
> - *Lesión cervical, lesión de hombro, costocondritis, lesión del área lumbar, fractura de costillas, visita y estadía en la Sala de Emergencia el día del accidente, placas, exámenes y visitas médicas relacionadas, entre otras: $70,000.00*
> - *Terapias (25 terapias físicas): $7,500.00*
> - *Impedimentos permanentes y limitaciones futuras: $24,000.00*
> - *Angustias Mentales: $17,500.00*
> - *Lucro cesante: $64,122.00*
>
> ***Nayda González:*** *$12,500.00*

Procedemos a discutir las partidas concernientes al co-apelado, señor Colon González.

En su alegato, los apelantes hacen referencia a una serie de casos,[116] para impugnar las indemnización concedida por los <u>daños físicos e impedimento</u>. Sin embargo, al examinar los mismos, notamos que son distinguibles del caso de autos. Nótese que el juzgador de instancia expuso claramente en su dictamen la

---

[116] *Resto Casillas v. Colon González*, 112 DPR 644 (1982); *Saurí Rodríguez v. Colón Martínez*, 127 DPR 900 (1991); *Portilla v. Carreras de Schira*, 95 DPR 804 (1968).

jurisprudencia que fungió de guía para su determinación,[117] por lo que entendemos que nos corresponde confirmar tanto los $70,000 otorgados al señor Colón por concepto de daños físicos, como los $24,000 por concepto del seis por ciento (6%) de impedimento.

En cuanto a la partida por terapias físicas y angustias mentales, el juez de instancia le otorgó al señor Colón González la suma de $7,500.00 y $17,500.00 respectivamente. La prueba presentada por la parte apelada demostró que el señor Colón González sufrió daños físicos que requirió una serie de tratamiento médico y terapías físicas por más de dos (2) año; incluso, tratamiento psicológico en el centro de salud mental INSPIRA.[118] Aunque el dictamen apelado no hace referencia a la jurisprudencia utilizada como punto de partida, la parte apelante no presentó argumentación sobre qué casos podríamos utilizar para llegar a un monto distinto. No obstante, en la discreción del juez sentenciador, vemos que las cantidades adjudicadas son razonables, por lo que resulta prudente no intervenir con la apreciación de la prueba.

En cuanto al lucro cesante, la parte apelante arguye que la prueba pericial presentada por la parte apelada no logró establecer la relación entre los daños sufridos por el señor Colón González como consecuencia del accidente, con su incapacidad para trabajar. No tiene razón. Las determinaciones de hecho que establecen el lucro cesante están sustentadas por la prueba testifical y documental desfilada en el juicio.[119] Allí, quedó debidamente establecido que —antes del accidente— el señor Colón González devengaba un sueldo de $26,000 al año, y como consecuencia de esos daños, perdió ingresos por no poder trabajar. En ese sentido,

---

[117] *Delgado Meléndez v. Browning Ferries Industries of Ponce, Inc.*, KLAN9701273; *García Aguirre v. Universal Ins. Co.*, 2016 WL5404742; y *Lugo Dijols v. Tamayo Pasarín*, KLAN 9600814.

[118] Véase, las determinaciones de hechos 19 – 36 que obran en la Sentencia apelada, a las págs. 74 – 75 del apéndice.

[119] Véase, las determinaciones de hechos 102 – 118 que obran en la Sentencia apelada, a las págs. 81 – 82 del apéndice.

el juzgador concluyó que, a pesar de los daños sufridos, el apelado no estaba impedido de volver a trabajar, el Dr. Martínez, opinó que el señor Colón González podía volver a laborar pero que, al hacerlo, no debía desempeñarse en oficios que requieran una carga física excesiva. También, surgió que el apelado no parecía estar interesado en volver a trabajar:

> [P]ara las fechas del Juicio en su Fondo, el Demandante no aparentaba haber hecho los esfuerzos necesarios para, dentro de un tiempo razonable después del accidente tomando en consideración las lesiones y daños que sufrió como consecuencia de este, procurar rehabilitarse para volver a trabajar en algún oficio o labor que pueda desempeñar. El propio codemandante declaró, al preguntársele si buscaba trabajo, que a veces iba al mall.[120]

No obstante, el juez concluyó que: "*el Demandante parecer estar sumido en una depresión que le impide realizar y entender que es una persona capaz y puede volver a trabajar*".[121] En ese sentido, calculó el lucro cesante hasta el año 2018. Tal determinación es una se ajusta a la prueba que obra en el expediente, por lo que sostenemos la partida de $64,122 por lucro cesante por ser razonable.

De igual modo, sostenemos la partida de $12,500 por <u>angustias y sufrimientos mentales</u> otorgada a la esposa del apelado, señora Nayda González. La prueba presentada demostró que la señora González sufrió angustias mentales al ver deterioro físico y depresión mental sufridos por el señor Colón González.[122] El TPI utilizó como punto de partida el caso *Delgado Meléndez v. Browning Ferries Industries of Ponce, Inc.*, KLAN9701273,[123] y la misma

---

[120] *Supra*, en la nota 9.
[121] *Id.*
[122] Véase, las determinaciones de hechos 54 – 59 que obran en la Sentencia apelada, a las págs. 76 – 77 del apéndice.
[123] Conforme al caso KLAN199701273, el índice de precios al consumidor para mayo de 1997 era de **81.115**, por lo que el valor adquisitivo del dólar era **$1.23**. Por lo cual, el ajuste por inflación: **$7,500** (Cantidad otorgada por angustias mentales en el caso KLAN199701273) **x $1.23** (Valor adquisitivo del dólar para mayo de 1997) **= $9,225**.
Por lo tanto, el ajuste por inflación **$9,225** dividido entre el valor adquisitivo del dólar para agosto de 2021 en que se emite la Sentencia apelada, **$0.82 = $11,250** como el valor presente de la cuantía concedida en el caso comparable.

resulta razonable y guarda relación con las angustias mentales sufridas por la señora González.

**En tercer orden,** la parte apelante alega que incidió el TPI al no reducir —de la indemnización otorgada la parte apelada— la exención provista por la *Ley de Protección Social por Accidentes de Automóviles*. No tiene razón. Veamos.

La *Resolución* del 22 de septiembre de 2021 declaró no ha lugar una *Solicitud de Determinaciones de Hechos Adicionales* presentada por la parte apelante. No obstante, el juez sentenciador hizo una importante aclaración en torno a las referidas deducciones:

> *En torno a la sección final de la reconsideración, <u>ACLARAMOS que, al establecer y especificar las cuantías de daños desglosadas en nuestra Sentencia,</u>* ***aplicamos las deducciones aplicables, requeridas por ley****. <u>Sin embargo, nos percatamos a raíz de lo expresado por las Terceras Demandadas que – inadvertidamente – obviamos incluir en el borrador final, firmado y notificado de la Sentencia la nota al calce aclarando haber realizado las correspondientes deducciones requeridas por ley, la que estaba en nuestros borradores iniciales de trabajo. Por ende, las cuantías concedidas por concepto de daños en la Sentencia ya tienen las deducciones requeridas.</u>*[124]

En virtud de lo anterior, el tercer señalamiento de error no fue cometido. Razón por la cual, se confirma la *Sentencia* apelada.

-**IV**-

Por los fundamentos antes expresados, **se confirma la *Sentencia* apelada**.

Lo acordó el Tribunal y lo certifica la secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[124] Apéndice XI de la *Apelación.* págs. 133-134.